**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOANN AGOSTINI, individually and on
behalf of all others similarly situated,

                *Plaintiff,*

        v.

KNORR-BREMSE AG; KNORR BRAKE
COMPANY; NEW YORK AIR BRAKE
LLC; WESTINGHOUSE AIR BRAKE
TECHNOLOGIES CORPORATION; and
FAIVELEY TRANSPORT NORTH
AMERICA INC.

                *Defendants.*

Docket No. _____

**CLASS ACTION COMPLAINT**

Plaintiff Joann Agostini, individually and on behalf of a class of all those similarly situated (the "Class"), by and through his undersigned counsel files this Class Action Complaint against Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake LLC, Westinghouse Air Brake Technologies Corporation, and Faiveley Transport North America Inc., and alleges the following:

**I.      INTRODUCTION**

1.      This action challenges the unlawful conspiracy by Defendants not to poach each other's employees in violation of Sections 1 and 3 of the Sherman Act. 15 U.S.C. §§ 1, 3. Specifically, Defendants entered into agreements not to solicit, recruit, hire without prior approval or otherwise compete for each other's employees (the "No-Poach Agreements").

2.      Defendants Knorr-Bremse AG ("Knorr") and Westinghouse Air Brake Technologies Corporation ("Wabtec"), along with their respective subsidiaries, are the world's

1

largest competitors for rail equipment used in freight and passenger rail applications. Faiveley Transport S.A. ("Faiveley") also competed with Knorr and Wabtec to attract, hire, and retain employees, and was acquired by Wabtec in or around 2016.

3.      The No-Poach Agreements date back to 2009, when senior executives at Knorr and Wabtec, including executives at several of their subsidiaries, entered into No-Poach Agreements with each other. Thereafter, in or around 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into No-Poach Agreements with each other, and, beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley, likewise, followed suit.

4.      The Department of Justice ("DOJ") investigated and uncovered these unlawful No-Poach Agreements and made its findings public on April 3, 2018 when it both filed and settled its claims against Knorr and Wabtec.  The DOJ investigation revealed that the No-Poach Agreements "suppressed and eliminated competition to the detriment of employees by depriving workers of competitively important information that they could have leveraged to bargain for better job opportunities and terms of employment."

5.      The DOJ settlement did not compensate employees who were injured by Defendants' No-Poach Agreements. Accordingly, Plaintiff, on behalf of himself and the class, brings this action to recover compensation for the injuries suffered as a result of Defendants unlawful collusion.

## II.      JURISDICTION AND VENUE

6.      Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

7.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of Clayton Act, 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

8.     Defendants are subject to the general and specific jurisdiction of this court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the Commonwealth of Pennsylvania, including contacts in furtherance of the conspiracy alleged herein and their transaction of business in this Commonwealth.

9.     Defendants engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States.

10.    Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more Defendants reside in this district.

## III.    PARTIES

11.    Plaintiff Agostini, is a resident of Pittsburgh, Pennsylvania. Plaintiff worked for Wabtec from October 2005 through April 2016. As a result of the conspiracy as alleged herein, Plaintiff earned less than she would have absent the alleged conspiracy.

12.    Defendant Knorr-Bremse AG ("Knorr") is a German company headquartered in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment.

13.    Defendant Knorr Brake Company is a Delaware corporation headquartered in Westminster, Maryland. It manufactures train control, braking, and door equipment used on passenger rail vehicles and is a wholly owned subsidiary of Defendant Knorr-Bremse AG.

14.     Defendant New York Air Brake LLC is a Delaware corporation headquartered in Watertown, New York. It manufactures railway air brakes and other rail equipment used on freight trains and is a wholly owned subsidiary of Knorr-Bremse AG.

15.     Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a publicly-held Delaware corporation headquartered in Wilmerding, Allegheny County, Pennsylvania. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services.

16.     Defendant Faiveley Transport North America, formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec.  It is a New York corporation headquartered in Greenville, South Carolina. In late 2016, Wabtec acquired Faiveley.  Prior to the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this complaint.

## IV.     FACTUAL BACKGROUND

17.     During the Class Period, Defendants and their subsidiaries employed Class members throughout the United States, including this judicial district.

18.     The unlawful and anticompetitive conduct engaged in by Defendants and their subsidiaries substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

19.     There is a high demand for skilled employees with rail industry experience, and the supply of such employees is limited.

20.     Companies within this industry routinely solicit or recruit potential employees from other companies within the industry, as well as receive direct applications from prospective

employees interested in employment opportunities.

21.    The solicitation of employees from other companies in the rail industry is an effective and efficient means of competing for employees with the requisite specialized skills.

22.    The rail industry, in particular, is an insular one – employees at the various competing companies form long-term relationships and often look to these networks to fill vacancies or seek out opportunities.

23.    This competition benefits employees because it increases the number of job opportunities and improves employees' ability to negotiate for, and obtain, better salaries and benefits as terms of their employment.

24.    Indeed, in the United States, ninety-five percent (95%) of the railroad equipment manufacturing industry revenue is generated by only the 50 largest companies, including Defendants.  Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

25.    Defendants Knorr and Wabtec (including Faiveley) are the world's largest rail equipment suppliers and each other's top competition for the development, manufacture, and sale of equipment used in rail applications.

26.    As of December 31, 2017, Wabtec employed approximately 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.

27.    As of December 31, 2016, Knorr employed approximately 24,500 employees worldwide.

28.    Defendants and their subsidiaries also compete with one another to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and

other favorable terms of employment.

29.     Defendants conspired to suppress the compensation paid to their workers by entering into a scheme not to solicit each other's employees.

### A.     The No-Poach Agreements

30.     Over a period spanning several years, Defendants Wabtec, Knorr, and Faiveley entered into No-Poach Agreements with each other (including between their subsidiaries) to eliminate competition for employees. The No-Poach Agreements were not reasonably necessary to any separate, legitimate business transaction or legitimate collaboration between the companies.

#### i.     The Wabtec-Knorr Agreement.

31.     Starting in 2009, Wabtec and Knorr entered into pervasive No-Poach Agreements that spanned multiple business units and jurisdictions.  These agreements involved promises and commitments not to solicit or hire each other's employees. In furtherance of their agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from the other company.

32.     In some instances, this No-Poach Agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake Company without prior approval of the other firm.

33.     Wabtec's and Knorr's senior executives actively managed and enforced the No-Poach Agreements and directly communicated with each other to ensure adherence to the agreements.

#### ii.     The Knorr-Faiveley Agreement.

34.     In or around 2011, Knorr Brake Company and Faiveley Transport North America reached a No-Poach Agreement that required notice to the other company before pursuing one of

6

its employees. Executives at Knorr Brake Company and Faiveley's U.S. subsidiary actively managed and enforced the agreement through direct communications with each other.

35.    This agreement continued until 2015 when Wabtec announced its acquisition of Faiveley.

### iii.    The Wabtec-Faiveley Agreement

36.    In or around January 2014, Wabtec Passenger Transit and Faiveley Transport North America entered into a No-Poach Agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

37.    Wabtec Passenger Transit and Faiveley Transport North America executives actively managed and enforced the agreement with each other through direct communications.

38.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

### B.    The Investigation by the United States Department of Justice

39.    In October 2016, the DOJ made clear that it would prosecute companies and individuals who enter into no-poach agreements.

40.    Following the October 2016 announcement, the DOJ and the Federal Trade Commission (the "FTC") jointly issued the Antitrust Guidance for Human Resource Professionals (the "Antitrust HR Guidance"), which confirmed that the DOJ would "proceed criminally against naked wage-fixing or no-poaching agreements" and that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third- party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is

deemed illegal without any inquiry into its competitive effects."

41.     In July 2015, Wabtec announced its intent to acquire Faiveley. The Antitrust Division of the DOJ began investigating Defendants Knorr-Bremse AG, including Faiveley Transport S.A., and Westinghouse Air Brake Corporation as a result of the DOJ's review of that merger.

42.     The DOJ's investigation uncovered the No-Poach Agreements between the companies and found that the companies' agreements unlawfully allocated employees between the companies and were *per se* illegal under the Sherman Act. The DOJ concluded that Defendants' agreements "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market." The DOJ also found that Defendants' No-Poach Agreements were prohibited "naked restraints on competition for employees and were not reasonably necessary to any separate legitimate business transaction or collaboration between the firms."

43.     On April 3, 2018, the DOJ filed a complaint in federal court against Defendants Knorr and Wabtec, and reached a settlement with the two companies, which the DOJ found "had for years maintained unlawful agreements not to compete with each other's employees."

44.     Under the terms of the settlement, Wabtec and Knorr, and their respective successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees, are prohibited from entering, maintaining, or enforcing no-poach agreements with each other or any other companies going forward.

45.     The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

8

46.     As part of the DOJ's filings, it emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." This restraint deprived workers of "competitively important information that they could have leveraged to bargain for better job opportunities in terms of employment."

**C.     Harm to the Plaintiff and Class and the Effect on Interstate Commerce**

47.     The unlawful No-Poach Agreements intended to and did suppress compensation and competition.

48.     In a competitive market, employers compete for the skilled talent.  As the DOJ explained, "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."

49.     With solicitation, competing employers may make offers of increased salary and benefits to a prospective skilled employee.  Likewise, as information about those offers makes its way into the labor market, it can lead to movement or negotiation by those employees with current employers or others.

50.     Solicitation also affects compensation practices by employers. Through this process, employers learn whether their compensation structure is sufficient to attract competitors' skilled employees, and may cause increases in offers to be more competitive. Likewise, companies at risk of losing employees to competitors may increase their employees' compensation in order to reduce their competitors' appeal.

51.     The No-Poach Agreements' restraint on active recruitment made higher pay opportunities less transparent to workers and allowed employers to keep wages and salaries down.

52.    Thus, the effects of solicitation reach not just those who are solicited, but the entire marketplace of these skilled workers, including Plaintiff and the class members.  The effects of Defendants' unlawful No-Poach Agreements reached just as far.

53.    The No-Poach Agreements also had a significant effect on interstate commerce.

54.    During the class period, Defendants employed Plaintiff and class members in multiple states, including Pennsylvania, Texas, New York, South Carolina, Maryland, and Delaware. Defendants' other subsidiaries employed workers in at least Ohio, Virginia, Kentucky, Illinois, California, and Wisconsin.

55.    Labor competition in the rail and freight industry is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location, and many class members moved between states to pursue opportunities.

56.    States compete to attract rail-equipment industry offices, leading employment in the industry to cross state lines.  Defendants' conduct substantially affected interstate commerce and caused antitrust industry throughout the United States.

### D.    Equitable Tolling of the Statute of Limitations

57.    Until the DOJ's settlement with Defendants became public on April 3, 2018, Plaintiff and class members had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff and the class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy.

58.    Indeed, Defendants actively concealed their unlawful activities in an effort to avoid criminal and civil penalties.

59.    For example, Defendants ensured that communications related to the No-Poach

10

Agreements, including the implementation and enforcement of them, were conducted by their senior executives.

60.    Additionally, Defendants publicly described themselves as competitors including in SEC filings, leading the public and their employees to believe that they would not be acting as co-conspirators.

61.    Wabtec, for instance, recognized Knorr as its main competitor in an SEC filing and reported that it "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates."

62.    Similarly, Wabtec instituted a Code of Conduct, which provided:

Wabtec is committed to fair and open competition in the markets it serves around the world and competes independently in the marketplace in compliance with the laws of the United States and other countries. You cannot engage in any understandings or agreements with competitors to restrain trade and must avoid the appearance of such conduct. Examples of antitrust violations are: (1) price fixing; (2) bid rigging; (3) collusion to allocate markets, customers or production; and (4) group boycotts. You must be particularly aware of these prohibitions and should exercise due care in situations where competitors may be present to avoid violating these laws.

https://www.wabtec.com/uploads/pdf/CodeofConduct.pdf (last revision date 2014).

63.    Knorr, likewise, instituted a Code of Conduct, which provided:

We are committed to observing the regulations on fair competition. In particular, in order to avoid infringing anti-trust legislation, it is not permitted to conclude agreements with competitors on
» prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company,
» non-competition, false tendering or
» apportionment out of customers, markets, areas, production programs etc.
http://www.knorr-bremse.com/media/documents/group/compliance_1/02_KB_Code_of_

Conduct_English_November_2012.pdf (last revision date 2012).

64.    Defendants engaged in a secret conspiracy that did not give rise to facts that would

place Plaintiff or the class members on inquiry notice that Defendants were engaged in the unlawful No-Poach Agreements.

65.     Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Defendants relied on non-public methods of communication in order to prevent dissemination of the conspiracy beyond the individuals involved and to avoid unnecessarily creating evidence that might alert Plaintiff or the class members to the conspiracy's existence.

66.     Upon information and belief, to cover up their conspiracy and prevent Plaintiff and Class members from learning that their compensation was suppressed through collusion, Defendants routinely provided pretextual, incomplete, or materially false and misleading explanations for compensation decisions and recruiting and retention practices affected by the conspiracy.

67.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims alleged herein.

## V.     CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons employed by Defendants or their wholly owned subsidiaries at any time from January 1, 2009 to the present.

69.     Excluded from the class are Defendants' senior executives, personnel in the human resources and recruiting departments of the Defendants, and employees hired outside of the United States to work outside of the United States.  Also excluded from the class are the Court, Court personnel, Counsel of Record, and all of their immediate family.

12

70.    The Class contains hundreds, if not thousands, of members, as each Defendant employed hundreds or thousands of Class members each year. The Class is so numerous that individual joinder of all members is impracticable.

71.    The Class is ascertainable either from Defendants' records or through self-identification in the claims process.

72.    Plaintiff's claims are typical of the claims of other Class members as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole.

73.    Plaintiff has retained able and experienced antitrust and class action litigators as his counsel. Plaintiff has no conflicts with other class members and will fairly and adequately protect the interests of the Class.

74.    This action raises common questions of law and fact that are capable of class-wide resolution, including:

a.    Whether Defendants entered into the No-Poach Agreements;

b.    Whether such agreements were per se violations of the Sherman Act;

c.    Whether Defendants fraudulently concealed their conduct;

d.    Whether and to what extent Defendants' conduct suppressed compensation below competitive levels;

e.    Whether Plaintiff and the other class members suffered injury as a result of Defendants' agreements;

f.    Whether any such injury constitutes antitrust injury;

g.    The appropriate measure of damages suffered by Plaintiff and the class members; and

13

h.      The nature and scope of injunctive relief necessary to restore a competitive market.

75.     These common questions predominate over any questions affecting only individual class members.

76.     A class action is superior to any other form of resolving this litigation. Separate actions by individual class members would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could create incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. There will be no material difficulty in the management of this action as a class action.

77.     Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

**COUNT I**
**VIOLATION OF SECTIONS ONE AND THREE OF THE SHERMAN ACT**
**15 U.S.C. §§ 1, 3**

78.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

79.     Defendants, by and through their officers, directors, employees, or other representatives, knowingly, intentionally, and cooperatively, entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict competition for class members' services through agreeing not to solicit each other's employees, with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

80.     Defendants' conduct injured Plaintiff and the Class by lowering their compensation and depriving them of free and fair competition in the market for their services.

81.     Defendants' No-Poach Agreements are a *per se* violation of Sections 1 and 3 of the Sherman Act.

## PRAYER FOR RELIEF

82.     WHEREFORE, Plaintiff Joann Agostini, individually and on behalf of a Class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

    a.  Certification of the Class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.  Appointment of Plaintiff as Class Representative and his counsel as Class Counsel;

    c.  Threefold the amount of damages to be proven at trial;

    d.  Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

    e.  A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

    f.  The costs of bringing this suit, including reasonable attorneys' fees and expenses; and

    g.  All other relief to which Plaintiff and the Class may be entitled at law or in equity.

15

## JURY TRIAL DEMAND

83.     Plaintiff demands a trial by jury on all issues so triable.


Dated: September 11, 2018                    /s/ Gary F. Lynch_____
                                             Gary F. Lynch
                                             PA ID.No. 56887
                                             glynch@carlsonlynch.com
                                             Benjamin J. Sweet
                                             PA ID No. 87338
                                             bsweet@carlsonlynch.com
                                             Kelly K. Iverson
                                             PA ID No. 307175
                                             kiverson@carlsonlynch.com
                                             CARLSON LYNCH SWEET KILPELA &
                                             CARPENTER, LLP
                                             1133 Penn Avenue, 5th Floor
                                             Pittsburgh, PA  15222
                                             (412) 322-9243
                                             (412) 231-0246

16